COLE et al. v. MANVILLE.

(Supreme Court, Appellate Division, First Department. February 2, 1912.)

SALES (§ 166*)—PERFORMANCE OF CONTRACT.

Where a contractor to construct for another an automobile body for a chassis according to a blueprint and sketch built a body which contained a body extension which the blue print and sketch did not call for, and which did not leave a space of three inches between the floor of the tonneau and the frame of the chassis as called for by the blue print and sketch, the purchaser was not required to accept the body or allow the contractor to make the necessary alterations, especially where the time for delivery of the body had expired, since the contract was within the class of contracts involving the personal tastes of the purchaser of an article in which strict compliance is required.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 166.*]

Appeal from Trial Term, New York County.

Action by George W. Cole and another, copartners, trading as Cole & Woop, against Charles B. Manville. From a judgment entered on a verdict for plaintiffs and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Burt D. Whedon, for appellant.

Malcolm Sundheimer (A. Maurice Levine, on the brief), for respondents.

LAUGHLIN, J. The plaintiffs have recovered on a contract whereby they agreed to make and deliver to the Milwaukee Auto Engine & Supply Company, at Milwaukee, Wis., for the defendant an automobile body for a chassis which said company was making for him. There is some conflict in the evidence with respect to the description of the automobile body which the plaintiffs were to make for the defendant; but a letter written by the plaintiffs to the Milwaukee company under date of March 16, 1909, shows that it was

to be made according to a pencil sketch made by the plaintiffs for the defendant and a blueprint drawing of the chassis made by the Milwaukee company, which was delivered to them by the defendant, and in the letter, which was written in reply to a letter from the Milwaukee company asking for a drawing with measurements of the body to be made by the plaintiffs, and by which the plaintiffs were expressly·informed that there must be an unobstructed space of three inches all over between the bottom floor of the tonneau and the frame of the chassis, and particularly requested that the front end of the body be made according to measurements as shown on a sketch which they inclosed, so that they could "give the front part of the same .shape on chassis," the plaintiffs informed the Milwaukee company that they had followed the blueprint in making the body, and that, if the blueprint was correct, "you will have no trouble with this body when you come to put it on your chassis." The blueprint plainly showed that the body of the automobile was to commence on the front line of the front seat and extend back therefrom, and that the extension of the body from that point forward, known as the "gunstocks" or "body extension," was on the chassis and part of it, and also showed an unobstructed space of three inches between the floor of the body or tonneau, and the frame of the chassis, and one of the pencil sketches made by the plaintiffs showed the same. The plaintiffs, in accordance with the Milwaukee company's request in said letter, sent two sketches of the body which they were to make. One of these was of the front end, and by its measurements and form indicated to the Milwaukee company that the plaintiffs understood that the body extension, or gunstocks, was to be on the chassis; but it indicated a departure from the blueprint in that it showed that the body of the car ended, not at a perpendicular line at the front of the driver's seat but 15 inches forward of that point. The ·Milwaukee company by letter to plaintiffs under date of March 19, 1909, accepted this departure from its blueprint and notified plaintiffs that it would construct the body extension to conform with the change and not according to the blueprint. Neither of the sketches showed the dimensions of the moldings on the sides of the body. The superintendent and general manager of the Milwaukee company wrote on the sketch of the front end the dimensions of the molding seven-eighths by three-eighths to correspond with the molding which was to be on the chassis, and also made a drawing on the sketch of the body extension and wrote on it, "This part is on chassis and made of aluminum," and then returned the sketches to the plaintiff. It appears that, on these sketches being returned to the plaintiffs, the one on which the changes were made was marked, evidently for the guidance of plaintiffs' workmen, "Make this to below sketch."

The evidence introduced on the part of the plaintiffs tended to show that the defendant gave them the order for the body shortly before Christmas in the year 1908, and that on the part of the defendant tended to show that the order was not given until the 3d day of February, 1909. It is fairly to be inferred from the evidence that, at the time the plaintiffs received this letter from the Milwaukee company inclosing the sketch, they had commenced to make the automobile

body, and it was completed and shipped to Milwaukee on the 8th day of May thereafter. One of the plaintiffs testified that the body shipped by the plaintiffs did not contain a body extension or gunstocks and complied with the blueprint and plaintiffs' sketches as amended, but his testimony shows that he did not claim that the three-inch space existed as the floor was placed; and plaintiffs' automobile body builder, who built this body, and who was called by the plaintiffs, testified generally that the automobile body shipped by plaintiffs was made according to the blueprint and sketches made by the plaintiffs based thereon, containing some alterations which were accepted by the Milwaukee company as already stated and some alterations made on the sketches by the Milwaukee company which were apparently accepted by plaintiffs, but on being particularly interrogated with respect to whether it contained a body extension, or gunstocks, he said that he could not tell whether he put the gunstocks on or not. Other testimony, however, given by witnesses called on the part of the plaintiffs, tended to show that the three-inch space was not left, and that the gunstocks were on the body; and the superintendent and general manager of the Milwaukee company, who received and examined the body shipped by plaintiffs, testified positively that the gunstocks were on it, and his company so notified the plaintiffs, as did the defendant also. The evidence also shows that the body shipped left a space of from one inch to one inch and three-quarters only between the frame of the chassis and the floor of the body. It appears that the space of three inches between the floor of the body and the frame of the chassis was required to afford room for the transmission and other parts of the machinery of the chassis, which extended 2¾ inches above the frame of the chassis.

Immediately on the receipt of the body by the Milwaukee company, the plaintiffs were notified, both by the company and by the defendant, that it did not conform to the contract in these and other respects. One of the plaintiffs thereupon went to Milwaukee and interviewed the superintendent and general manager of the Milwaukee company and the defendant; and, according to his testimony, the superintendent and general manager of the Milwaukee company referred him to the defendant, who refused to accompany him and point out the defects. The defendant, however, testified that the defects were stated, and this plaintiff admitted that mistakes had been made and offered to take the body back to New York and have the defects remedied, which the defendant declined on the ground of the delay that would be caused thereby, and that the defects could not be remedied and have the car appear as it should and as it would appear if properly constructed originally. The body extension, or gunstocks, on the chassis to be made by the Milwaukee company, and which according to the evidence introduced by the defendant was made and ready for the body, except for some parts which could be attached only when the body was on the chassis, was made of aluminum, and the body extension, or gunstocks, on the body delivered by the plaintiffs, was of wood, the same as the rest of the body. The plaintiffs claimed and offered evidence tending to show that the body extension, or gunstocks, if on, could have been cut off the body furnished by them, and

that the floor of the tonneau was not permanently in place and could have been elevated to afford the requisite space of three inches, by inserting under the sills of the body strips of wood, known as shim rails, which are sometimes used, at a comparatively small expense. The plaintiffs, however, neither attached nor furnished shim rails, and it is not claimed that either the blueprint or the sketches showed that shim rails were to be used. It is manifest that, if shim rails were used, the car would not present the same appearance as if deeper sills were used to accomplish the same object. It also appears that the molding on the body furnished by the plaintiffs did not conform to the sketch in dimensions, and therefore would not match the corresponding molding on the body extension, or gunstocks, which was part of the chassis. We do not deem it necessary to comment on the controversy with respect to providing a door to the tool box under the rear seat, for there is a fair conflict in the evidence on that point. Shortly after these interviews with one of the plaintiffs at Milwaukee, defendant shipped the body back to plaintiffs, who refused to receive it, and it was stored by the railroad company.

If, as the preponderance of the evidence shows, the body shipped by the plaintiffs contained a body extension, or gunstocks, which according to the blueprint and sketch it was not to contain, and did not leave a space of three inches between the floor of the tonneau and the frame of the chassis, the defendant was under no obligation to accept it and make the alterations in these respects, or to allow the plaintiffs to make them, for the reasons already stated, and for the further reason that the time within which the plaintiffs were to deliver the body had expired. This contract bears no analogy to building contracts, where the rule of substantial performance obtains, but falls rather within the. class of contracts involving the personal taste of the purchaser, in which strict compliance is required.

It follows, therefore; that the judgment and order should be reversed on the ground that the verdict is against the weight of the evidence, and a new trial granted, with costs to appellant to abide the event. All concur.